

**FILED**

**JAN 2 5 2021**

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH TUCCERI, III,<br>GWEN TUCCERI, aka "CRYSTAL<br>TUCCERI,"<br><br>Defendants. | <u>I N F O R M A T I O N</u><br><br>**1:21 CR 12**<br><br>CASE NO._____<br>Title 18, United States Code,<br>Sections 666(a)(2), 1341, 1343,<br>1346, and 2; Title 26, United<br>States Code, Section 7206(1)<br><br>**JUDGE BOYKO** |

<u>GENERAL ALLEGATIONS</u>

At all times relevant to this Information, unless otherwise specified:

1.     The City of Cleveland (hereinafter, "the City") was a political subdivision within the State of Ohio.

2.     The Cuyahoga County Land Reutilization Corporation (hereinafter, "CCLRC"), also known as the Cuyahoga County Land Bank, was a non-profit, government-purposed organization registered in the State of Ohio.  CCLRC invited qualified demolition contractors from its list to bid on batches of properties to demolish.

3.     A contractor performing demolition work in the City, both as part of a CCLRC project and a private project, was required to obtain permits from the City before the CCLRC or private entity would deem the job completed and issue payment.

4.     Defendants JOSEPH TUCCERI, III ("JOSEPH TUCCERI") and GWEN TUCCERI, aka "CRYSTAL TUCCERI," were residents of Kirtland, Ohio.

5.     Defendants owned and operated R Demolition LLC ("R Demolition"), a business that provided demolition and construction services, among other things, in the Cleveland, Ohio, area.

6.     Defendants and R Demolition performed demolition work for the City and CCLRC.

7.     Rufus Taylor ("Taylor") (charged separately) was employed by the City as the Chief of the Demolition Bureau and was an agent of the City.  Among other responsibilities, Taylor was responsible for assigning inspections, conducting inspections, and for supervising others conducting inspections.  A contractor performing demolition work in the City was required to pass two inspections, conducted by the Demolition Bureau, as part of any demolition job, including private jobs: (1) a clean-hole and sewer bulk (or "bulkhead") inspection and (2) a final compliance inspection.  If a contractor passed the final compliance inspection, Taylor or one of his subordinates signed the permit for the job.  This final inspection was required before a contractor could receive payment for the job.

<u>COUNTS 1-5</u>
(Honest Services Mail Fraud, 18 U.S.C. §§ 1341, 1346, and 2)

The United States Attorney charges:

8.     The allegations contained in paragraphs 1 through 7 of this Information are incorporated by reference as if stated fully herein.

<u>The Scheme to Defraud</u>

9.     From in or around December 2016, and continuing through in or around May 2018, in the Northern District of Ohio, Eastern Division, Defendants JOSEPH TUCCERI, III ("JOSEPH TUCCERI") and GWEN TUCCERI, aka "CRYSTAL TUCCERI," devised and intended to devise a scheme and artifice to defraud and to deprive the City and the citizens of the

2

City of their intangible right to the honest services of Rufus Taylor (charged separately), a City official, through bribery.

<u>Purposes of the Scheme</u>

10. The purposes of the scheme included, but were not limited to, the following:

a. For Defendants to receive favorable official action from the City by paying Taylor bribes in exchange for faster service and other favorable treatment regarding demolition inspections, both on specific matters pending and expected to be pending before Taylor and as opportunities arose, so that Defendants could in turn obtain faster payment for demolition jobs, which gave Defendants a competitive advantage by being able to move on to other demolition jobs in a more timely manner than their competitors;

b. For Defendants to receive favorable official action from the City by paying Taylor bribes in exchange for favorable treatment on other City matters in exchange for Taylor pressuring and advising other City officials regarding specific matters pending and expected to be pending before those other officials and as opportunities arose, so that Defendants could in turn obtain faster service and processing by the City, and receive other favorable treatment; and

c. For Defendants to benefit and enrich themselves and R Demolition through bribery of Taylor and the resulting favorable official action.

<u>Manner and Means of the Scheme</u>

11. The manner and means by which Defendants carried out the scheme included, but were not limited to, the following:

a. Defendants gave, offered, and promised things of value to Taylor, including multiple cash payments, to obtain faster service from Taylor and the City.

b.      Defendants made such payments to Taylor with the intent to influence, and in exchange for, official acts, including Taylor's own decisions and actions on matters, such as conducting inspections and issuing permits, and the scheduling of the same.  Defendants and Taylor knew and intended that Taylor's advice would form the basis for official acts by other public officials that would benefit Defendants, and further knew and intended that Taylor would use his supervisory authority over other City employees to exert pressure on them to perform official acts that would benefit Defendants.

c.      From time to time, Defendants offered to pay, and did pay, Taylor money in exchange for Taylor to use his official position to provide, and agree to provide, assistance in ensuring that work performed by R Demolition would be quickly inspected after completion.

d.      From time to time, Defendants offered to pay, and did pay, Taylor money in exchange for Taylor to use his official position to more quickly finalize and provide Defendants with the necessary inspections for work performed by R Demolition.

e.      From time to time, Defendants and Taylor spoke on the phone and in person to discuss Defendants' requests for official action favorable to Defendants and R Demolition.  During some of these meetings, Defendants paid Taylor in cash.

f.      Defendants used, and caused and directed others to use, interstate wire communications and mail delivered by the United States Postal Service and any private or commercial interstate carrier.

### Acts in Furtherance of the Scheme

12.      The acts caused by Defendants in furtherance of the scheme included, but were not limited to, the following:

4

13.     In or around December 2016, GWEN TUCCERI agreed that R Demolition would perform demolition work for the City at a job site on Colonial Avenue in Cleveland, Ohio (the "Colonial Avenue Demolition").

14.     On or about February 13, 2017, Defendants met with Taylor after Taylor, acting in his official capacity, completed the Colonial Avenue Demolition final compliance inspection, and GWEN TUCCERI paid Taylor $60 cash in exchange for Taylor's favorable treatment in connection with that inspection.

15.     On or about February 16, 2017, GWEN TUCCERI sent, and caused to be sent, an email to CCLRC, arranging a time to sign R Demolition's contract to perform demolition work for the CCLRC at a series of addresses, including job sites on West 67th Street (the "West 67th Street Demolition") and East 77th Street (the "East 77th Street Demolition") in Cleveland, Ohio.

16.     In or around February 2017, GWEN TUCCERI agreed that R Demolition would perform demolition work for the CCLRC at a series of addresses, including the West 67th Street Demolition and the East 77th Street Demolition.

17.     On or about March 9, 2017, Defendants met with Taylor after Taylor, acting in his official capacity, completed the West 67th Street Demolition final compliance inspection, and Defendants paid Taylor $100 cash in exchange for Taylor's favorable treatment in connection with that inspection and the prior clean-hole and bulkhead inspection.  JOSEPH TUCCERI initially paid Taylor $50 by throwing it in the window of Taylor's vehicle, and GWEN TUCCERI then switched out the $50 payment in exchange for a $100 payment.

18.     On or about March 10, 2017, Defendants met with Taylor after Taylor, acting in his official capacity, completed the East 77th Street Demolition clean-hole and bulkhead

5

inspection, and GWEN TUCCERI paid Taylor $100 cash in exchange for Taylor's favorable treatment in connection with that inspection.

19.     On or about March 30, 2017, GWEN TUCCERI sent, and caused to be sent, an email to CCLRC, with attachments, seeking payment for the West 67th Street Demolition, the East 77th Street Demolition, and another job.

20.     On or about April 7, 2017, CCLRC sent Defendants, via an interstate carrier, a check that included partial payment for R Demolition's work at the East 77th Street Demolition.

21.     In or around April 2017, GWEN TUCCERI agreed that R Demolition would perform demolition work for the CCLRC at a series of addresses, including job sites on East 57th Street (the "East 57th Street Demolition") and Morton Avenue (the "Morton Avenue Demolition") in Cleveland, Ohio.

22.     On or about April 14, 2017, GWEN TUCCERI and Taylor had a conversation on the telephone.  During the conversation, they discussed Taylor obtaining information for GWEN TUCCERI regarding a potential demolition job at a property known as the Acme Building, and GWEN TUCCERI agreed that she wanted to keep their arrangement "on the low-low [confidential]." Taylor indicated that he was getting information for her, and GWEN TUCCERI told Taylor she would "take care of you [Taylor] greatly."  GWEN TUCCERI added, "You know how we do it."

23.     On or about April 25, 2017, Defendants met with Taylor after Taylor, acting in his official capacity, completed the East 57th Street Demolition clean-hole and bulkhead inspection, and Defendants paid Taylor $95 cash in exchange for Taylor's favorable treatment in connection with that inspection and other continued favorable treatment, including Taylor providing Defendants with information about the Huntington Playhouse Building and the Acme

6

Building.  JOSEPH TUCCERI initially paid Taylor $60, and GWEN TUCCERI then paid Taylor an additional sum of $35.

24.     On or about May 1, 2017, GWEN TUCCERI and Taylor had a conversation on the telephone.  During the conversation, they discussed Taylor coming to another site to perform an inspection.  GWEN TUCCERI stated, "I'll take care of you."  Taylor responded, "Thank you."

25.     On or about May 3, 2017, Defendants met with Taylor after Taylor, acting in his official capacity, completed the Morton Avenue Demolition clean-hole and bulkhead inspection, and GWEN TUCCERI paid Taylor $100 cash in exchange for Taylor's favorable treatment in connection with that inspection and for continued favorable treatment.  Taylor thanked GWEN TUCCERI for the money, and she responded, "I'm going to give you another two," indicating that she would pay him additional money for other inspections and "research" Taylor was performing for R Demolition.

26.     On or about May 19, 2017, GWEN TUCCERI and Taylor had a conversation on the telephone.  During the conversation, they discussed their arrangement.  GWEN TUCCERI stated, "We appreciate you," and that she would "take care of everything I owe you for" when they planned to meet the following Monday.  Taylor said he was grateful for "whatever you [GWEN TUCCERI] do to show your appreciation."

27.     On or about May 22, 2017, Defendants met with Taylor after Taylor, acting in his official capacity, completed the Morton Avenue Demolition final compliance inspection, and JOSPEH TUCCERI paid Taylor $150 cash in exchange for Taylor's favorable treatment in connection with that inspection and for continued favorable treatment.  During the meeting, Defendants discussed the financial arrangement with Taylor, including Taylor repaying them for

a prior loan with inspections. Taylor asked, regarding the loan, "We good [am I paid off now]?" GWEN TUCCERI agreed, and Taylor stated, "Now we just keep it moving [continue exchanging bribes for favorable treatment]." GWEN TUCCERI stated repeatedly, "We appreciate you." After Taylor thanked JOSEPH TUCCERI for the payment and said they would "continue to handle our business," GWEN TUCCERI said, "I'll take care of you with the other stuff [pay you for the other upcoming inspections]."

28.     In or around May 2017, GWEN TUCCERI agreed that R Demolition would perform demolition work for the CCLRC at a series of addresses, including job sites on East 78th Street (the "First East 78th Street Demolition") and Holton Avenue (the "Holton Avenue Demolition") in Cleveland, Ohio.

29.     On or about May 30, 2017, Defendants met with Taylor to complete the First East 78th Street Demolition clean-hole and bulkhead inspection. During the meeting, GWEN TUCCERI stated that she would "take care of" Taylor for the "research" he had done. GWEN TUCCERI said that when Taylor returned to the site "to sign off [on the inspection], I'll take care of you [pay you]." GWEN TUCCERI added, "I'll have all your money for those [inspections]." JOSEPH TUCCERI said, "Okay Ruf." Taylor responded, "Good looking, thanks Joe."

30.     On or about May 30, 2017, Defendants met with Taylor after Taylor, acting in his official capacity, completed the First East 78th Street Demolition clean-hole and bulkhead inspection, and JOSEPH TUCCERI paid Taylor $100 cash in exchange for Taylor's favorable treatment in connection with that inspection and other continued favorable treatment.

31.     On or about June 12, 2017, GWEN TUCCERI met with Taylor after Taylor, acting in his official capacity, completed the Holton Avenue Demolition final compliance

8

inspection and paid Taylor $300 cash in exchange for Taylor's favorable treatment in connection with that inspection and other inspections Taylor completed, including the final compliance inspection at the First East 78th Street Demolition.

32.      On or about June 30, 2017, CCLRC sent Defendants, via an interstate carrier, a check that included partial payment for R Demolition's work at the First East 78th Street Demolition.

33.      In or around July 2017, GWEN TUCCERI agreed that R Demolition would perform demolition work for the CCLRC at a series of addresses, including job sites on East 78th Street (the "Second East 78th Street Demolition"), East 72nd Street (the "East 72nd Street Demolition"), East 65th Street (the "East 65th Street Demolition"), and East 91st Street (the "East 91st Street Demolition") in Cleveland, Ohio.

34.      On or about July 12, 2017, Defendants met with Taylor after Taylor, acting in his official capacity, completed the Second East 78th Street Demolition clean-hole and bulkhead inspection, and JOSEPH TUCCERI paid Taylor $100 cash in exchange for Taylor's favorable treatment in connection with that inspection and other continued favorable treatment.  During the meeting, Taylor stated, "This a quick service for you guys," and, referring to the bribes he receives, added, "that's the good thing for me."

35.      On or about July 14, 2017, CCLRC sent Defendants, via an interstate carrier, a check that included partial payment for R Demolition's work at the East 57th Street Demolition, the Morton Avenue Demolition, and the Holton Avenue Demolition.

36.      On or about July 17, 2017, JOSEPH TUCCERI met with Taylor after Taylor, acting in his official capacity, completed the East 72nd Street Demolition clean-hole and

bulkhead inspection and paid Taylor $100 cash in exchange for Taylor's favorable treatment in connection with that inspection and other continued favorable treatment.

37.     On or about August 10, 2017, Defendants met with Taylor after Taylor, acting in his official capacity, completed the East 65th Street Demolition clean-hole and bulkhead inspection, and GWEN TUCCERI paid Taylor $200 cash in exchange for Taylor's favorable treatment in connection with that inspection and other continued favorable treatment.  During the meeting, GWEN TUCCERI explained that she did not like R Demolition employees calling an inspector to the jobsite.  She stated, "I will call the inspector I want.  I call my own inspector." Referring to the larger size of the bribe, GWEN TUCCERI stated, "that's a back something [payment]" to cover other inspections and services.

38.     On or about August 11, 2017, CCLRC sent Defendants, via an interstate carrier, a check that included partial payment for R Demolition's work at the Second East 78th Street Demolition.

39.     On or about August 14, 2017, Defendants met with Taylor after Taylor, acting in his official capacity, completed the East 91st Street Demolition clean-hole and bulkhead inspection, and Defendants paid Taylor $200 cash in exchange for Taylor's favorable treatment in connection with that inspection and other continued favorable treatment.  When handing over the money, GWEN TUCCERI stated, "Joe going to give you some, but here is some from me too."

40.     On or about September 1, 2017, CCLRC sent Defendants, via an interstate carrier, a check that included partial payment for R Demolition's work at the East 65th Street Demolition.

41.     On or about September 18, 2017, GWEN TUCCERI sent, and caused to be sent, an email to CCLRC, with attachments, seeking partial payment on a number of invoices, including invoices for the West 67th Street Demolition, the East 77th Street Demolition, and the East 91st Street Demolition.

42.     On or about October 10, 2017, GWEN TUCCERI sent, and caused to be sent, an email to CCLRC, with attachments, providing documentation in support of the prior invoice for seeking payment for the East 91st Street Demolition.

Execution of the Scheme

43.     On or about the dates set forth below, in the Northern District of Ohio, Eastern Division, Defendants, aiding and abetting one another, for the purposes of executing and attempting to execute the above-described scheme and artifice to defraud and deprive, used and caused to be used the United States Postal Service and any private or commercial interstate carrier to deliver the following items, each mailing constituting a separate count of this Information:

| Count | Approximate Date | Mailing |
|---|---|---|
| 1 | April 7, 2017 | Check issued by CCLRC to R Demolition including payment for the East 77th Street Demolition |
| 2 | June 30, 2017 | Check issued by CCLRC to R Demolition including payment for the First East 78th Street Demolition |
| 3 | July 14, 2017 | Check issued by CCLRC to R Demolition including payment for the East 57th Street Demolition, the Morton Avenue Demolition, and the Holton Avenue Demolition |
| 4 | August 11, 2017 | Check issued by CCLRC to R Demolition including payment for the Second East 78th Street Demolition |
| 5 | September 1, 2017 | Check issued by CCLRC to R Demolition including payment for the East 65th Street Demolition |

All in violation of Title 18, United States Code, Sections 1341, 1346, and 2.

COUNTS 6-9
(Honest Services Wire Fraud, 18 U.S.C. §§ 1343, 1346, and 2)

The United States Attorney further charges:

44.     The allegations contained in paragraphs 1 through 7 and 9 through 42 of this Information are incorporated by reference as if stated fully herein.

Execution of the Scheme

45.     On or about the dates set forth below, in the Northern District of Ohio, Eastern Division, Defendants JOSEPH TUCCERI, III and GWEN TUCCERI, aka "CRYSTAL TUCCERI," aiding and abetting one another, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud and deprive, transmitted and caused to be transmitted by means of wire and radio communication in interstate commerce the signals and sounds described below for each count, each transmission constituting a separate count of this Information:

| Count | Approximate Date | Interstate Wire Communication |
|-------|------------------|-------------------------------|
| 6 | February 16, 2017 | E-mail to CCLRC, with subject line "Re: R Demolition – Demo Batch 1701F Contract is Ready to Sign" |
| 7 | March 30, 2017 | E-mail to CCLRC, with subject line "Invoice," with attachment |
| 8 | September 18, 2017 | E-mail to CCLRC, with subject line "Invoices", with attachments |
| 9 | October 10, 2017 | E-mail to CCLRC, with subject line "XXXX E. 91 Invoice for R Demolition," with attachments |

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

COUNT 10
(Bribery in Federally Funded Programs, 18 U.S.C. §§ 666(a)(2) and 2)

The United States Attorney further charges:

46.     The allegations contained in paragraphs 1 through 7 and 9 through 42 of this Information are incorporated by reference as if stated fully herein.

47.     During the one-year period beginning on or about December 1, 2016, and ending on or about November 30, 2017, the City of Cleveland, a government organization as defined by Title 18, United States Code, Section 666(d)(2), received benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance and/or other form of Federal Assistance.

48.     From on or about December 21, 2016, to on or about November 20, 2017, in the Northern District of Ohio, Eastern Division, Defendants JOSEPH TUCCERI, III and GWEN TUCCERI, aka "CRYSTAL TUCCERI," aiding and abetting one another, did corruptly give, offer, and agree to give a thing of value to any person intending to influence and reward an agent of a local government and an agency thereof, in connection with any business, transactions, and series of transactions of such local government and agency involving something of value of $5,000 or more, to wit: GWEN TUCCERI gave, offered, and agreed to give Rufus Taylor, a public official with the City of Cleveland, approximately $60 cash in exchange for Taylor providing favorable treatment to R Demolition regarding the final compliance inspection for the Colonial Avenue Demolition, a job valued at approximately $6,393.

All in violation of Title 18, United States Code, Sections 666(a)(2) and 2.

## COUNT 11
(Making and Subscribing False Income Tax Returns, 26 U.S.C. § 7206(1))

The United States Attorney further charges:

49.     The allegations contained in paragraphs 1 through 7 and 9 through 42 of this Information are incorporated by reference as if stated fully herein.

50.     Defendant JOSEPH TUCCERI, III ("JOSEPH TUCCERI") owned and operated JTS Machinery and Supply Corporation ("JTS Machinery"), a business engaged in online sales, until 2012. By 2016, JOSEPH TUCCERI had transferred ownership of JTS Machinery to his

13

son, but continued to control aspects of its finances and operations, and received substantial income from JTS Machinery, largely in the form of (1) using a JTS Machinery credit card on personal expenses, in substantial part on cash advances obtained and substantially spent by JOSEPH TUCCERI and Gwen Tucceri at casinos; and (2) transfers of funds from a JTS Machinery account to accounts JOSEPH TUCCERI controlled.

51.     R Demolition was a partnership and reported its receipts on an Internal Revenue Service ("IRS") Form 1065, U.S. Return of Partnership Income, which income JOSEPH TUCCERI and Gwen Tucceri were required to report on their joint U.S. Individual Income Tax Return, Form 1040, in for the calendar year 2016.

52.     Ohio National Services and Disposal ("ONS") was a partnership and reported its receipts on an IRS Form 1065, U.S. Return of Partnership Income, which income JOSEPH TUCCERI and Gwen Tucceri were required to report on their joint U.S. Individual Income Tax Return, Form 1040, in for the calendar year 2016.

53.     On or about April 8, 2017, in the Northern District of Ohio, Eastern Division, Defendant JOSEPH TUCCERI, a resident of Kirtland, Ohio, did willfully make and subscribe a joint U.S. Individual Income Tax Return, Form 1040, for the calendar year 2016, which was verified by a written declaration that it was made under the penalties of perjury and which JOSEPH TUCCERI did not believe to be true and correct as to every material matter.  That income tax return, which was filed with the Internal Revenue Service, understated the total income (on line 22) by failing to report income JOSEPH TUCCERI and Gwen Tucceri had that year from JTS Machinery, R Demolition, ONS, and other sources, as a result of which the return understated the amount of taxes owing.

All in violation of Title 26, United States Code, Section 7206(1).

14

## COUNT 12
(Making and Subscribing False Income Tax Returns, 26 U.S.C. § 7206(1))

The United States Attorney further charges:

54.     The allegations contained in paragraphs 1 through 7, 9 through 42, 49 through 51 of this Information are incorporated by reference as if stated fully herein.

55.     On or about April 8, 2017, in the Northern District of Ohio, Eastern Division, Defendant GWEN TUCCERI, aka "CRYSTAL TUCCERI," a resident of Kirtland, Ohio, did willfully make and subscribe a joint U.S. Individual Income Tax Return, Form 1040, for the calendar year 2016, which was verified by a written declaration that it was made under the penalties of perjury and which GWEN TUCCERI did not believe to be true and correct as to every material matter.  That income tax return, which was filed with the Internal Revenue Service, understated the total income (on line 22) by failing to report income Joseph Tucceri, III and GWEN TUCCERI had that year from JTS Machinery, R Demolition, ONS, and other sources, as a result of which the return understated the amount of taxes owing.

All in violation of Title 26, United States Code, Section 7206(1).

BRIDGET M. BRENNAN
Acting United States Attorney

By: _____
ROBERT E. BULFORD
Chief, Criminal Division

15